The first case of the morning is Super Budget Liquors v. Budget Liquors, 411-0332 for the appellant, Mr. Turner, for the appellant, Mr. Minnick. You may proceed. May I please report and counsel? Good morning, your honors. It's a pleasure to be here this morning. It's a pleasure to have the first case of the day. I'm somewhat of a morning person, and in spite of the morning rainfall, that's kind of a pleasant feeling that's created in me by rain, having, you know, originally been born and raised on a farm, and know the value of rainfall year-round for farm productivity. In this case, I'd like to address what I think is the controlling issue initially with regard to the FAFSA. I'd indicate that at any time you have a question, please interrupt me, and I'd like to reserve time for rebuttal. That is, if not used, or whatever is otherwise appropriate for rebuttal. The pertinent fact in this case is the discussion with the mayor of Normal, which led immediately to blocking the liquor license application process, and it being set for approval with the county. In this case, the Normal Council, the Municipal Council, is the Liquor Commission. Is it your contention that everything that was required for the approval of a liquor license was in the hands of the clerk or whoever accepted those things and presented them to the council? It's our contention that that is the case. It may not have been perfect, but it was ready for consideration, and no one on behalf of the municipality, not the clerk, not the mayor, not anyone else, has issued or stated or made criticism of the condition of the application after the submission of the financial information of the three owners of the applicant, other than the action of the mayor to simply block it. In looking at the actions that occurred, if you consider the conversation or conversations, and measure those conversations in time, then there can be an argument that that's an inconsequential event and isn't major interference. However, I don't believe in the law and in the application of the law of interference that we measure events based on time. It could have been, for example, a situation, hypothetically, where someone lobbies the mayor for weeks to get him to do something. That doesn't make that effort any more consequential than if it took two minutes to get the mayor to go into action on behalf of a constituent. So the time frame involved, the amount of time, isn't pertinent. What is pertinent in the law of interference and the application of the law of interference is the effect of the action. Was it material? Did it have real meaning here? In this case, it was substantial. It was controlling. It blocked the liquor license application from moving forward. Once the mayor ordered the assistant attorney for the town, a staff attorney with years of experience, and being the counsel for liquor proceedings, to issue a memorandum, a memo, to the town staff that this was not going to go forward until the mayor was satisfied about things. That action stopped everything. Wasn't it reasonable for the mayor to say, why should we go through with this meeting until there's a completed deal? Isn't it a waste of time? No, it's not a waste of time. It is standard process, standard procedure for licenses to be approved, conditional, and a closing. We all know that a deal is not a deal until it's done. Were there problems with the deal when the seller met with the mayor or talked to the mayor? At the time the seller was meeting with the mayor, I believe the evidence indicates that the seller's concern was whether the buyers were going to obtain financing. It turns out in this case that financing really was not an issue at all because the sellers could independently make the purchase with minimal assistance from the bank. Permanent financing had not been arranged, had not been finalized, and had not been approved at that time. It was still in the process. But the evidence is that these folks would have been able to complete this transaction. And if you look at the financial information, which is by and large undisputed in the record, it's clear that they had independent means to pay a substantial portion of the purchase price. Almost all of it with cash on hand that was available to them. So they were going to try to get the loan from the Illini Bank with $750,000 from Farmer State Bank of Camp Point, but that hadn't been done. But you say, oh, they had the money in their pocket. They had in excess of a million dollars of cash available to them. And the inventory loan, which was $300,000, had been approved and would have been made on June 1 in order to fund the purchase of the inventory. When you combine their cash resources with the inventory loan, they had more money than was needed in order to complete the purchase. But that wasn't the way they were going to complete the purchase. Oh, no, it wasn't at all. There was a snafu that arose in the underwriting of the loan. It had to do with the fact that the first appraiser didn't appraise it. And once it was determined that he wasn't going to be appraising it, then they called in a second appraiser in order to do it. If you recall, the record shows that the second appraiser made numerous attempts to preview the property. He had appraised it earlier before it was budget liquor for another party. He had a file on it, but he needed to personally see the premises. In the process of arranging that, he ends up communicating with the transactional attorney for the seller, who said there was not going to be a closing. It was four days yet until the closing. He said there's no reason for you to go forward, so he didn't. The same transactional attorney on behalf of the seller told the buyer's transactional attorney, at about the same time, a few days before the deadline, regardless of what you do, there's not going to be a closing. There's nothing you can do to create a closing. There's not going to be one. That is classic contract repudiation. Why would the seller scuttle this deal? Well, you know, that is a mystery. Well, that also indicates that what you're saying is not correct, that this was not some sort of scheme between the mayor and the seller. Oh, I'm not suggesting there's a scheme, Your Honor. I'm suggesting that the parties were acquainted, the mayor and the seller were acquainted, they were business neighbors. So the seller's not allowed to talk to the mayor? Oh, no. Certainly we have free speech. But listen, when the conversation leads to blocking the application, which the mayor reported to the seller and did not report to my clients, did not report to the buyer, when those events occur and the seller knows the application is blocked, I believe that's some of the... When you consider the seller's transactional attorney's comments with the fact that the seller sat on his hands with regard to knowledge that the application was not going forward, that's an indication that the seller did not want the closing to occur at all. And I have to say that that's extremely unusual. The restatement second of contracts has been cited over and over again in all the state courts. To have a contract, you have to have mutual assent. That means a meeting of the minds. When that occurs, when there's a meeting of the minds, usually both parties to a contract become emotionally attached to the contract and they're rooting for performance of the other party. They're wanting performance. They want the other party to perform as provided for in the contract. Because of that, having cases of contract interference is quite rare. Human nature actually cuts the other way. Human nature indicates that parties want the other party to the contract, after the mutual assent now, to perform. In this case, for whatever reason, that didn't occur. But it is clear based on the facts. It is, in fact, undisputed based on the facts that in this case, for some reason the seller was not interested in seeing a closing and took action, which resulted in the closing being blocked entirely. Let me ask you a question, Mr. Turner. Understanding about conditional approval and so forth, one of the requirements would be the stockholders or shareholder statement. My understanding of the record as it stands now is that the required statement, the required stockholder statement of the fourth individual, I think it might have been Anish Patel, but it was one of the four, was not filed timely, was never filed, and is not part of the record. And that would be a prerequisite separate and apart from Mr. Cutler and separate and apart from anything the mayor said. That would be a prerequisite for the clerk to take any action in setting up a hearing. Well, that would be for the court to decide. If you recall the evidence clearly from the mayor and also from the council, with years, you know, 20 years' experience on this, was it's up to the court to decide whether the file is complete. But there is an explanation, Your Honor, that's also in the record that pertains to that. Anil Patel, he was the brother of one of the owners. He's a computer scientist. He's got a great job with IBM in New Jersey. He hasn't been in business, and he was prepared to lend his financial support to his brother in Bloomington, Illinois, in order to accomplish this. When they initially filed the disclosures about the officers and owners, he was listed. However, later they filed the charter of the LLC, which was the applicant, and it does not show him as an owner, and he was not going to be an owner or an officer. To correct the file, so it was precise, and that's why I responded, Your Honor, to your question about whether the application was ready. I said it wasn't perfect. The imperfection, the only imperfection I know of, is that someone should have crossed his name off as an officer and initialed it. In the record, it indicates that amendments to the application occur as easy as that way. With the blessing of the court, sometimes they could occur with a letter, sometimes with just simply an explanation. But that wasn't a defect sufficient to block it from proceeding forward with the process. If someone had concern about whether all of the parties had filed the pertinent information, which was applicable, then that could have easily been clarified. When the buyer signed the contract to make the purchase at that point, there was some question about, well, just what all do we do in order to arrange the funding for this? And, you know, this brother volunteered his support, but it was later determined he wasn't going to be an owner, and that's clear in the record. It's explained there in the record. Okay, that part's explained, but it wasn't taken care of, and it's missing at the time Briggs makes the decision to say to herself, I can't put this on the agenda for May 18th because I got the financial information. It was faxed to me, but it was faxed to me too close to the date. And Anil Patel's name, I still don't have his shareholder statement. Is she there? Okay, I'm sorry. And the conversation regarding the future doesn't take place until a day or two later between the seller and the mayor. So the decision has already been made that this is not going to be on the May 18th council, and it would appear that that was the decision of the clerk, because that happens before. So then we've got this intervening period where the mayor and Cutler have a conversation, and we're still at the point where Anil Patel's name is present. And I assume you're correct that that could have been clarified. Absolutely. But it wasn't. That seems to be a problem. In response, Your Honor, the mayor, in response to the town clerk, never criticized the file with regard to officer disclosures. That was not the reason why it didn't go to the May hearing. Well, she said she didn't get it in a timely fashion because it was faxed the day before or whatever, and she didn't have time to talk to them. And she noted that she still didn't have the shareholder statement from Anil Patel. Whether he's an officer or not, it would be a shareholder statement. She didn't say she didn't have the shareholder statement as a reason for not putting it on the agenda. She said as a reason for not putting it on the agenda, it was the lateness of getting the financial information and the financial information only, and that was the only request that was made to complete the file. She noted that there was not an officer's statement in the file after the litigation was commenced. There was never an observation of that prior to the time. And it really has no pertinence to this decision because it's not particularly meaningful. That is an example of an inconsequential circumstance which would not have impacted negatively the application. Well, except it would have required a special hearing. Because if it's not on the May 18th agenda, then it's not going to be on the agenda. It can't regularly be on the agenda, I guess, until June 1st, if that would be correct. That would be correct. So somebody is going to have to have a special meeting between May 18th and June 1st in order to accomplish what the seller wanted to accomplish. Well, the council meetings are at 7 p.m. on the 2nd and 4th Monday. It's either the 2nd and 4th Monday or the 1st and 3rd Monday of every month. So the next one was June 1st. So it would be the 1st and 3rd Monday of every month. Normal has it and Bloomington has it on the alternate Mondays in our Twin Cities. So there was a council meeting that convened June 1. There was a Liquor Commission meeting convened, and that's also on the record, at the very same time for another applicant. And this one could have been on it. And there could have been a closing on June 1st to complete this deal. For example, if you ask, well, how can that be? There could have been an escrow closing that afternoon or morning, conditioned on the vote that night. Once the vote occurred, the escrow was released, the seller has his money well before midnight on June 1st. I see that I've got some limits here to my time, but the main point that we would like to suggest here on this appeal is that there was an error of law in the application of the law of interference. You don't look at the time that's devoted to an event or to an activity. You look at the impact of it. It may have been originated somewhat casually, and yes, there is freedom of speech, and you would think that conversation among friends might be harmless, but the impact of this conversation, when you're talking about the career, the life, the sole business of the seller, that's not a casual topic. That's not a personal topic. That's not the discussion of the weather. That is a meaningful issue, and when that results in the mayor's action, and when that action is reported to the seller, but never reported to the buyer, never reported by the mayor, the mayor never had conversation with the buyer, it's not reported to the buyer by the town clerk either, that's a very meaningful interference, and it's the sort of interference that the law of interference is designed to address, and once the interference is triggered, then the contract, then these conditions that you're talking about, that the seller has to perform, become absolute. Once they're absolute, it is available then, under the law of specific performance, for the court to order specific performance. Would the plaintiffs be required to go to Cutler and say, we'll buy it regardless, there's been some hold up of the liquor license application, can we just buy it, because you've reported or represented that they had sufficient cash to go forward, and that they were fairly confident they were going to get the bank's approval, maybe at some later date if they got the liquor license, but they could comply with the contract by telling the buyer, okay, we'll give you your million dollars, or whatever the amount is. But for the interference, in order for the buyer to complete the transaction, and have the right to complete the transaction, the buyer would have had to perform. So Cutler won't sell unless you've got a liquor license? No. It's in response to your question, Your Honor. Right. The buyer would have to perform, and for the buyer to perform, if the buyer didn't have that liquor license on June 1st, the buyer would have to unconditionally tender the money in order to have the right to enforce the transaction. But there was interference, and it was major interference, and the opportunity to get the liquor license was gone. And so the seller's future performance, the tender unconditionally waiving the liquor license, which would have been required otherwise, was no longer an issue. The contract was absolute. The law presumes that the liquor license was obtained, and that the seller, now in an action for specific performance, needs to allow the buyer to proceed with the liquor license application, get it approved, and complete the deal without interference. Well, and I understand the interference is a significant issue for you. But what I'm thinking to myself is, if I've got $1.2 million, and I'm fairly confident of the bank financing, which I may need for the future, but I don't need for this immediate event, and my appraisal is not as complete, but I know that the building has been previously completed, why don't I call up the Cutler and say, we're ready to close. We don't care about that. We know you've been frustrated. We're frustrated too. We were trying to comport with these requirements. We know that this is a good deal. Here's your money. Is Cutler going to say, I don't want it? Yes, that's what happened. Your Honor, in the record, it's very clear that the buyer's transactional attorney placed that phone call. And he said, I'd like to get this arranged so we can get this done. And the response was what I said earlier, and it's in the record, and it's almost verbatim, it doesn't make any difference, Mac, what you do. The lawyer's first name is McClain, and he's known as Mac. It's not a disrespectful reference. Mac, there's nothing you can do that's going to result in a closing. Forget about it. There's not going to be a closing. That phone call was made. Excuse me, Your Honor, for pointing, but the buyer did make that phone call and tried to get things arranged so there could be a closing, but wasn't given an opportunity. Okay. We'll hear from you on rebuttal. Thank you. May it please the Court, my name is Robert Nurick, I'm a member of the law firm of Costa and Woolworth in Bloomington, Illinois. You have to remember how old we are. I know. Keep your voice down. Because that doesn't amplify. Okay. It records, it doesn't amplify. Well, I'm used to lecturing at church, and sometimes when I stand and lecture at church, I end up screaming, so I never know how the microphone is. We'll start over. Good morning. May it please the Court, Mr. Turner. My name is Robert Nurick, I'm a member of the law firm of Costa and Woolworth in Bloomington, Illinois, and I'm here on behalf of the defendant appellee, Budget Liquors, Inc. My last appellate court argument was a case from this court, which, because of the fact that my client was the state's attorney and the plaintiff was the county clerk of McLean County, got transferred to the Fifth District for oral argument and decision. As I sat at the consul table, I got the complaint dismissed with prejudice, which was ultimately affirmed on appeal. But as I sat at the consul table and listened to my opponent make his initial statement to the court, there were a number of inaccurate statements of fact that I thought that he made. I'm sure they were unintentional. And as I stood up to argue, I said to the court, I said, You know, as I sat there at the consul table, I was tempted several times to jump up and say, I object because of the inaccurate statements that were made. The presiding judge started to chuckle and said, Mr. Nery, that's happened several times in this courtroom. There have been a number of inaccurate statements of fact made by Mr. Turner, so many that I can't correct them in 20 minutes that I have to present my case to the court. I will try and correct some of them as I go through, but I will ask the court to rely on the record, a lot of which Mr. Turner said to you this morning as being factual statements that were in the record, but quite frankly, not there. On April 3, 2009, Budget Liquors entered into a contract with Super Budget Liquor LLC to sell a building and a liquor store business located in Normal, Illinois. The contract provided parties were to close on or before June 1 of 2009, a relatively short time, and the time was of the essence. At the assistance of Super Budget and its consul, the contract was contingent on two things. One, it was contingent on the buyer obtaining a liquor license for the time of Normal, and two, it was contingent on the buyers obtaining financing. Super Budget did not get a liquor license in time to close on June 1, 2009, and four days later, on June 5, 2009, the consul meeting was on Monday, June 1, and on Friday, June 1, or Friday, June 5, they filed a verified amended complaint in which they stated that Mr. Cutler had contacted the town of Normal and canceled a hearing on their application. Mr. Cutler engaged me, we started discovery, and several months later, they filed an amended complaint, and in their verified under oath amended complaint, they made the same allegation. Mr. Cutler frustrated their ability to get a liquor license by contacting the town of Normal and canceling a hearing for their liquor license application. We filed a cover claim seeking the recovery of attorney's fees and costs under paragraph 19 of the contract, which provides that if litigation takes place under the contract, the losing party has to pay attorney's fees and costs. We had a bench trial. After a lot of discovery and depositions and so forth, we had a bench trial that was conducted in March of this year, and at the conclusion of the plaintiff's case, after the presentation of ten witnesses, the trial court directed a verdict in favor of budget liquors. Several days later, the court entered a summary judgment in favor of budget liquors for its attorney's fees, expenses, and costs. It's kind of unusual, as I explained in the brief procedural situation, which the plaintiff did not object to, other than the fact that the plaintiff said, we don't think you were correct in granting a direct verdict, but we agree with this procedural vehicle that since you did direct the verdict, even though we don't think it's right, they are entitled to recover on their counterclaim. And a few days later, a judgment was entered for the amount of the attorney's fees, which they did not contest. Mr. Turner has framed one issue. He's gotten into finances here. He's talked about finances. He's talked about, oh, yes, we had enough money to buy it, and so forth. None of that is in the brief. None of that was raised in the brief, and I didn't address it in the brief because of it. But if you will look in the record, these statements that he made about financing are, quite frankly, inaccurate. These people apply for financing. Their contract called for a purchase price of $1.2 million plus inventory at cost. They apply for financing with Illini Bank. That financing was contingent on various things. It was contingent on an appraisal of the property, and it was specifically the bank president said they wouldn't loan the money unless these people got a liquor license from the town of Normal, which, as we know, they ultimately never did. It was also, as the evidence developed, and which is in the record in the trial court, Haresh Patel, one of the people involved in Superbudget Liquors LLC, was at or near his lending limit with Illini Bank. He was into Illini Bank for, I think, either $11.2 or $11.5 million, and he was approaching his lending limit. And the bank's director loan committee, when they approved this loan, conditionally on April 30, 2009, said in the minutes of the director's loan committee, which is in the record, that they had to have a participation on this loan. The bank president testified of that under oath when Mr. Turner called him to testify. They had to have a $750,000 participation of this loan from the Farmer State Bank of Camp Point, a completely independent but sister bank under the same holding company as Illini Bank, either from the Farmer State Bank of Camp Point or some other bank. And if they didn't have that $750,000 participation, they wouldn't make the loan. Now, I didn't put all that in my brief because that was not raised. Financing wasn't raised as an issue by Mr. Turner in his brief. But that's something that is in the record. Furthermore, Mr. Turner makes these statements to the effect, we had the cash. I almost heard him say that we could have just paid cash for this and got the financing later. If I look frustrated, it's because none of that is set forth in the record. If you will look at my cross-examination of the three Patels, and the three Patels who all testified at the trial, Heresh, Rakesh, and Kamlesh Patel, they tried to say to the trial judge, we've got the money. But you look at my cross-examination of those people. For example, just as an example, Heresh Patel listed as one of his assets that he had full control over and could contribute to purchase this business. A miner's custodial account established for his miner son under the Illinois Uniform Miners Act. Well, if you look under that act, he had no more control over that money than the man in the moon. The same thing he did with one of his daughters. He had an account with one of his daughters that was joint. He said, oh, I have control over all this money. Interestingly enough, I thought in a cross-examination, he reported both those accounts, the interest on those accounts to the IRS under his children's social security numbers. You can draw your own conclusions as to the control he had over that account. Another account that he said he had total control over was an account standing in the name of his wife. That brought out on cross-examination part of that account was an IRA. You said there was no evidence in the record. It sounds like there was some evidence in the record. You just disputed it. Well, there wasn't evidence in the record that they had $1.2 million in cash. They testified they did. When you look at the cross-examination... I'm just trying to balance what you're saying here. You said there's no evidence in the record, and then you attacked the evidence. No, there was no evidence in the record that they had $1.2 million without the loan, that they couldn't have bought this without the loan from Illinois Bank was the point I was trying to make.  It sounds like they have a lot of money. They do have a lot of money. But it's spread out. You're complaining that it's spread out among other individuals. I'm not complaining at all. I'm saying that they did not have the cash to buy this. They were dependent on the financing from Illinois Bank. This is not part of the appeal. I only bring it up because Mr. Turner brought it up in his argument. The issue on appeal, as he set forth, is whether the seller's interference with the contract entitled the buyer to obtain specific performance. And he posits that on this conversation with the mayor. I set forth in the brief what the plaintiff must prove in order to establish specific performance. Is it true the mayor told the liquor commissioner not to go ahead with the hearing on June 1st? No. There was no hearing on June 1st. I know. Was that because the mayor said not to have one? The mayor... Well, it's two reasons. Justice Connick, which I set forth in the brief, Justice Connick addressed the main issue, was that the file was incomplete, which I want to talk about. Yes, the mayor did send an email. The mayor sent an email on May 20th, 2009, at two-something in the afternoon. He didn't send the email. He went to the assistant corporation counsel, a man by the name of Wayne Karplus, and asked Mr. Karplus to send an email to the town clerk, saying to the town clerk, I don't want this set on an agenda until we're satisfied that the parties have a deal and they are actually going forward. And the mayor testified at the trial that that was part of his standard practice, his standard procedure for all liquor license applications, not just this one. But he did send that email. Interestingly enough, one hour before that email was sent, the transactional attorney for Super Budget, Mr. Arnold, had sent a facsimile letter to Mr. Pratt, the lawyer for budget liquors, an hour earlier, saying, you know, we need extra time to close this contract. Please give us an extension of time in order to get a liquor license. So when you look at it, the email from the mayor is just, to me, kind of a red herring, whatever phrase you want to put on it, because the real issue is, they didn't have their application complete and on file in time to get a liquor license. The standard of proof that they had to meet in this case was clear and convincing evidence, which is different than a normal, run-of-the-mill civil case. It means more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. I discussed in the brief about Section 2-1110 of the Code of Civil Procedure, when you have a bench trial at the end of the plaintiff's case, the trial judge has to first look and see if there's any evidence, then he has to look and see. You know, that email you said the plaintiff's lawyer sent, it said he wanted more time because the town had been unable to put the liquor license application on the May 18th agenda, but it said the application would be heard on June 1st. The plaintiff would close on the sale at the first opportunity thereafter. And if you look in the record, there is in the record, I forget what exhibit it is, the agenda for the town of Normal on June 1st, 2009, and this liquor license application was not on it. It was never. The town clerk testified and the mayor testified, but in particular the town clerk. This liquor license application was never on any agenda at any time. So, why did the mayor tell the clerk not to put it on June 1st? He testified that the only reason June 1st was in the email, that just happened to be the next date that the town council would meet. Just to clarify one thing, the mayor is the liquor commissioner for the town of Normal, and the town council is the liquor commission. Under the town ordinance, there's four regularly scheduled liquor license hearings. I think they're, I can't rattle them off, but there's none in June. They're at four equally spaced times, like January and March and July and October, something like that. But they do have, at the start of council meetings, they will have a special meeting prior to the start of a regularly scheduled council meeting to hear liquor license applications other than those dates. So that's why we're talking about May 18th, June 1st, these are times when the town council was generally meeting. The mayor testified in my recollection, he testified in the record, that the only reason June 1st was in that email that he sent was because that was the next regularly scheduled council meeting. Mr. Arnold didn't send an email, he sent a facsimile letter to Attorney Pratt. He stated there, my clients have told me that the liquor license application is going to be set on June 1st, when in fact the evidence of trial showed that that was not true, that was not accurate. Judge Lawrence, when he went through, before I say that, we've had some comments here that Mr. Cutler did not want to go through with this. We've heard comments this morning that he somehow wanted to scuttle this contract. After he signed the contract on April 3, what did he do in order to be able to close on June 1st? He got a title commitment letter, delivered copies of all the apartment leases and management contracts to the plaintiff's attorney, got a certificate of good standing from the Illinois Secretary of State's office, obtained a bulk sales stop order from the Illinois Department of Revenue, notified all 13 of his employees that they would be out of a job effective June 1st. He went out and looked for and identified Section 1031 exchange property for the building, which was a part of the contract. He also hired a manager for that property. He also went out because he was going to be out of a job. He was selling not only the building, he was selling his business. And as part of the contract, they had a restrictive clause in the contract that he could not be engaged in the retail sale of alcohol in McLean County for a period of five years, etc., etc. They also had a clause in the contract, which he signed, that he was going to be a consultant, free of charge, for super budget for 20 hours a week for the first two weeks after they took the business over on June 1st. So he went out, after he signed the contract, he went out and got a new job. He obtained a job as Director of Sales for McLean-London County for a quarter's peer distributorship. Scheduled to start after this two-week period of consultation expired. Plaintiff's Transactional Attorney at trial, Mr. Arnold, admitted that as of May 26th, five days before they were supposed to close, there was nothing Mr. Cutler was supposed to do that he had not done under this contract. That does not sound like somebody who's trying to torpedo or scuttle or get out of a contract. And Mr. Cutler testified at trial that he was ready, willing, and able to close, but they didn't close. He was even asked by Mr. Turner, would he still think this was a good deal, the $1.2 million? He said, yes, I think that's a fair price. The decision of Judge Lawrence to direct the verdict was neither unreasonable, arbitrary, nor against the manifest weight of the evidence. I know sometimes in reading appellate court decisions, the appellate court will say, well, we wish the trial court had explained his or her rationale as to why they decided a certain way. Judge Lawrence went through, and it's set forth in the record, he went through carefully as to why he was deciding to direct the verdict in this case. He looked at the allegations of the complaint, and he said, those obviously haven't been proven. Everybody testified that there was no way Mr. Cutler would have contacted the town council and canceled a meeting. That was not within his province to do. And he went through and talked in some detail about what Justice Connect addressed. And that was the fact that the town clerk testified that the application, this isn't just in this case. This is in any case. The town clerk testified the application does not go before the council and the mayor, quote, until all of the forms are completed. And she said those forms were not complete for the May 18th meeting, and they were also not complete for the June 1st meeting, unquote. He then went on and talked about this email. And he said the email was not sent by Mr. Cutler, was not sent at the request of Mr. Cutler. And when you look in the record, you will see Mr. Cutler didn't even know the email had been sent. Mr. Cutler didn't ask the mayor to send the email and knew nothing about it. That was totally done by the mayor on his own accord. But Judge Lawrence went on and said the defendant himself had absolutely nothing to do with the fact that the agenda never had this liquor license application on it. The reason that happened was because necessary papers that had to be filed just were not completed. And so far as the evidence shows, they were never completed. And he went on to say Mr. Cutler is not responsible for the actions of the town clerk. And when you look at this with this evidence, these people had an application to file for a liquor license by March 20th. The contract wasn't signed until April 3rd. They had the liquor license application before they ever signed the contract. They didn't file the application until April 29th of 2009. It was a verified, under oath application. And when they did that, they had to list the names of every individual who had a 5% or more interest in the entity that was applying for the license. And in doing that, they listed four individuals. Harish, Rakesh, Kamblesh, and Anil Patel as owning 5% or more. The town clerk testified the reason why that's in there is so the town can investigate. I'm sorry I'm talking fast. Investigate the backgrounds of the people. There was never one filed by Anil Patel. They come in now and they say to you, you know, he wasn't involved in this. He had no interest in this whatsoever. But interestingly enough, when the town clerk said to them, you know, you filed the wrong financial documents. You've got to file the financial profit law statements, balance sheets, and so forth of the people who are the applicants. What did they file? They filed the financial statements of all of these people, including Anil Patel. The record also shows that Anil Patel was a 35% guarantor of the $1.2 million that they proposed to borrow from Illini Bank. The town's ordinance specifically required that you had to have a shareholder statement filed, a stockholder statement filed by every individual who has a 5% or more interest in the applicant. They filed it for all of the Patels except Anil Patel. Never did. And until they did that, until that paperwork was complete, whether it's this case or any other case, the application did not go before the town council or the mayor. That's not unique to this case. That's the way they operated in normal for years and years and years. So the reason that they didn't get the liquor license is because they never completed all the required paperwork, and Judge Lawrence's decision in this situation was correct. Could the buyers just have eliminated Anil as an owner? I don't know. They didn't. That's what council says. Well, I know what council says, but I have to address this court on the record before this court and what was brought out under oath of trial. You said that the matter was never set for June 1st. But the letter or the e-mail you talked about on May 20th said we want to set it on June 1st, didn't it? No, you're confusing. There are two things that happened on May 20th. First, on May 20th, the attorney for the buyers, Mr. Arnold, sent a facsimile letter to Mr. Pratt, the attorney for the seller, saying we need an extension of time. We haven't gotten our liquor license and we'd like an extension of time. Let me ask if this is the letter stated the application would be heard on June 1st and plaintiff would close on the sale at the first opportunity thereafter. Is that what it said? That's what Mr. Arnold's facsimile letter said. One hour later, one hour later is when the mayor's e-mail, I should say the mayor's e-mail, the e-mail was sent by Attorney Karplus at the request of the mayor. So the e-mail, the e-mail is like a red herring in this case. The e-mail is not the reason why this was never set on agenda. The reason this was never set on agenda was something that the buyers didn't do. It wasn't Mr. Cutler's responsibility to file an application for a liquor license with the town of Normalty's people. That was not a condition that he had to comply with. It was something that the buyers had to comply with and they just didn't do it. They certainly didn't do it on time. Couldn't they have done it between May 20th and June 1st? Pardon me, Your Honor? Couldn't they have done it between May 20th and June 1st? Could have done what? Filled out the application or completed the application? Why does the mayor on May 20th say there is not going to be a hearing on June 1st? He didn't say there wasn't going to be a hearing. He said I don't want this set on an agenda until we're assured that the parties are going to go forward and we have a completed deal. And he testified at trial that was his procedure and his practice on every liquor license application. They did not want to go through with the application process if for whatever reason the deal of the parties was not going to be complete. At least that's what he testified to under oath. I mean, Mr. Turner is trying to make it seem like this is some kind of secret cabal or this procedure by the mayor is something unique to this case and he testified it was not. That's something that was their standard practice for years. We have here a failure on the part of the buyers to timely comply with the requirements of the contract and they're trying now to shift it. They tried to at the trial to shift it over to the seller. It wasn't the seller's obligation. The same is true with respect. He talked about the appraisal. You need to wrap up. The decision of Judge Lawrence was correct. I would ask you to review the record and you will see that it was correct. His decision was not against the manifest weight of the evidence. It was not arbitrary or unreasonable. It was based on the evidence before him and his appraisal of the witnesses and their credibility. We ask that his decision granting a directed verdict be affirmed and his decision granting a summary judgment for the attorney's fees, costs, and expenses be affirmed as well. Thank you. Rebuttal, Mr. Turner? All references to the past in the brief of the appellant and the reply brief of the appellant, which I used in argument here earlier this morning, are specifically referenced in the record. We'll stand by the accuracy of what I said earlier. Also, the briefs are well documented and go directly to the page in the record where those facts are contained. The city court testimony was that after that memo was issued, there was nothing further done on that application. There was no determination made to say it was incomplete or inaccurate or anything else. It just simply stopped dead in its tracks. At trial, after the litigation commenced, her comment was that that part appears to be incomplete. It needs to be clarified. But that was a trial. That was a litigation comment, not a decision that occurred during the events that unfolded in this case. There was no request for any additional information or for correction. What needed to happen was not that there be an additional affidavit or disclosure filed, but simply the striking of his name on the application and it being an issue, or a letter stating such, or just an explanation, an oral explanation. I think all three of those would have sufficed. But that makes it sound like the town clerk is supposed to call you up and say, you're still not doing what you're supposed to do. And I guess if I was a citizen, I'd like that if the town clerk called me up, but I don't know that the town clerk, that that would be the process. Let me just mention one more fact. In addition to that, the charter that was filed of the LLC only lists three owners. It doesn't list Anil as an owner. Anil was prepared to lend his financial strength to the transaction, and before the charter was ever created, the three parties discussed how to put the matter together. Although they have the same last name, they are not relatives. And, you know, it's not like one family here. There are three different families. And so, you know, there was discussion. You know, how is Anil going to participate in this? That is not something that would have slowed down this process at any stage or step. And it is not. If there is a red herring, that is it. The reason that it wasn't done on June 1st was because of the mayor's memo, and I think that's clear. And when you couple that with the fact that the mayor never once told the buyers, neither did the city clerk, of the mayor's action there, you know, it's understandable why it didn't happen on June 1st. Why didn't it happen on May 18th? Timing. The court didn't consider the financial disclosures to be sufficient enough and asked for more. She told them, she told the buyers that the application was not sufficient. Exactly. And you were just telling us that you guys had no understanding that the application was insufficient. After those were filed, she called. She knew that he was in a convention in Washington, D.C. She called him on his cell phone. She had his cell phone number. From that convention, he arranged to have all those financial disclosures instantly made and did so. From that point forward, the application was complete. It wasn't perfect, but it was complete and sufficient to go forward. Well, you never filed the information regarding a deal, right? The information, it was a correction that was needed, not additional information. Well, was the correction made? Why wasn't it? Was it? No, it was not. No. So, the clerk is just supposed to read some tea leaves and figure that out? The court never even got to that point, Your Honor, because the mayor's memo, once we get to that stage, nothing... Well, assume I disagree with you on that assertion. Okay, okay. How would the clerk know? The clerk may not ever figure it out. But that would not make the application insufficient for hearing, and it would not make the liquor license application vote invalid, and it would not constitute any problem whatever. The perfection in application is not what we're here about. There's no requirement that something be, you know, like ivory soap, 99 and 99 hundredths percent pure. I'm sure in appellate processes, the goal is to have everything done exactly according to the rules and exactly like it should happen, but I suspect that almost in every appeal there's a document or something that has a... Did Arnold ever ask that the matter be set on June 1st? Yes, and they were led to believe it would be, and that's why the letter that you refer to, Your Honor... Well, but he asked, the only thing he references about June 1st is the facsimile, or not the facsimile, but the call that he makes. When the clerk advised him that May 18th wasn't going to work, she told him the next one will be June 1st, and the upshot of that conversation... Now, she didn't set it, and it wasn't set on June 1st, but the implication from that conversation is that the next one would be June 1st, and it would be heard then, and that's why the letter from McLean Arnold indicates that it will occur on June 1st. That was the understanding. What didn't happen was there was no communication that indicated otherwise, and by the time they figured this whole thing out, it was, you know, just one big mess because of what the mayor had done. Okay, please conclude. The point is an error of law in the application of interference law. You don't look at the time frame involved in the event, you look at the effect. The effect was the material, and the effect caused the contract to become absolute. Thank you very much for your time, and it's a pleasure to be here, and thank counsel.